Corey M. Eschweiler, Esq. (Bar No. 6635)
GLEN LERNER INJURY ATTORNEYS
4795 South Durango Drive
Las Vegas, Nevada 89147
Telephone:   (702) 877-1500
Facsimile:   (702) 933-7043
ceschweiler@glenlerner.com

Colin P. King (UT Bar No. 1815)
*(Pro Hac Vice Pending)*
cking@dkowlaw.com
DEWSNUP KING OLSEN WOREL
HAVAS MORTENSEN
36 South State Street, Suite 2400
Salt Lake City, UT 84111
Telephone: (801) 533-0400

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Ryan Q. Claridge,<br><br>            Plaintiff,<br><br>vs.<br><br>I-FLOW CORPORATION, a Delaware corporation; I-FLOW, LLC, a Delaware limited liability company; DJO LLC (f.k.a. DJ ORTHOPEDICS, LLC), a Delaware limited liability company; DJO, INCORPORATED, aka DJO, INC., a Delaware corporation; STRYKER CORPORATION, a Michigan corporation; and STRYKER SALES CORPORATION, a Michigan corporation,<br><br>            Defendants. | CASE NO.:<br><br>**COMPLAINT<br>AND JURY DEMAND** |

Plaintiff, Ryan Claridge, by and through his counsel, complains of Defendants, I-Flow Corporation; I-Flow, LLC; DJO, LLC; DJO, Incorporated, aka DJO, Inc.; Stryker Corporation; and Stryker Sales Corporation, demands a jury trial, and alleges as follows:

**JURISDICTION**

1.      This Court has subject matter jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1332 as Plaintiff was a citizen of Nevada at the time of his surgery, and is currently a citizen of Nevada, and Defendants are citizens of different states.

2. This Court has personal jurisdiction over Defendant I-Flow Corporation, a Delaware corporation with its principal place of business in Lake Forest, California. Defendant I-Flow has conducted regular and sustained business in Nevada by selling and distributing its products in Nevada.

3. This Court has personal jurisdiction over Defendant I-Flow, LLC, a Delaware Limited Liability Company, with its principal place of business in California. Defendant I-Flow, LLC, has conducted regular and sustained business in Nevada by selling and distributing its products in Nevada. Defendants I-Flow Corporation and I-Flow, LLC, will be referred to as "Defendant I-Flow."

4. This Court has personal jurisdiction over Defendant DJO, LLC (formerly known as DJ Orthopedics, LLC), a Delaware Limited Liability Company with its principal place of business in Vista, California. Defendant DJO, LLC, is registered to do business in the State of Nevada.

5. This Court has personal jurisdiction over Defendant DJO, Incorporated, aka DJO, Inc., a Delaware corporation with its principal place of business in Vista, California. Defendant DJO, Incorporated, has conducted regular and sustained business in Nevada by selling and distributing its products in Nevada and at all relevant times was doing business in the State of Nevada. Defendants DJO, LLC, and DJO, Incorporated, will be referred to as "Defendant DJO."

6. This Court has personal jurisdiction over Defendants Stryker Corporation and Stryker Sales Corporation, which are Michigan corporations with their principal places of business in Kalamazoo, Michigan. Stryker Sales Corporation is registered to do business in the State of Nevada, and these Defendants have conducted regular and sustained business in Nevada by selling and distributing their products in Nevada, as described below. Collectively, Defendants Stryker Corporation and Stryker Sales Corporation are referred to herein as "Defendant Stryker."

7. The amount in controversy exceeds $75,000 exclusive of interest and costs, and there is complete diversity of citizenship.

**GENERAL ALLEGATIONS**

8. Defendants, or one of their subdivisions, agents, or alter egos, designed, tested, manufactured, assembled, labeled, marketed, distributed, and sold pain pumps.

9. The pain pump is a medical device intended to deliver, via catheter, a continuous dose of pain medication directly into the operative site immediately following surgery.

10. The pain pump is designed and intended to be used with commonly used anesthetics such as bupivacaine, with or without epinephrine, over the course of two days or more.

11. The continuous injection of such medications over time directly into the shoulder joint can cause serious and permanent damage to the shoulder joint cartilage, chondrolysis, the death of the chondrocytes and a complete or nearly complete destruction of cartilage in the shoulder joint.

12. At all pertinent times, Defendants represented to the public and to health-care professionals that the pain pump was a safe and effective product used for post-operative pain management.

13. At all pertinent times, Defendants represented to the public and health care professionals that pain pumps could appropriately be used in or near the shoulder joint.

14. At all pertinent times, Defendants knew that their pain pumps were not cleared by the United States Food and Drug Administration ("FDA") for use in the joint space.  In fact, Defendants knew that the FDA, as early as 1999, had repeatedly rejected their requests for permission to market these devices for orthopedic use and/or use in the joint space, based on a lack of safety data.

15. At all pertinent times, Defendants knew or should have known that their pain pumps, when used with anesthetic medications in the joint space, could be toxic to shoulder joint cartilage. Defendants failed to conduct studies to determine the toxicity of their pain pumps to human cartilage when used with anesthetic medications in the joint space.

16. Defendants actively promoted their pain pumps to orthopedic surgeons for orthopedic use and/or use in the joint space, despite the FDA's denial of permission to market the device for these indications, and despite Defendants' failure to test the safety of their pain pumps for joint space use.

17. Defendants did not warn Plaintiff Ryan Claridge or his surgeon that pain pumps had been denied clearance by the FDA for orthopedic use and/or use in the joint space and that pain pumps' safety for such indications had not been established.

18. Defendants did not warn Plaintiff Ryan Claridge or his surgeon about the unreasonable risks and dangers of using the pain pump and anesthetic medications in this manner.

19. Plaintiff Ryan Claridge's surgeon used the pain pump in the manner instructed and directed by Defendants.

20. In November 2009, the FDA issued a report warning healthcare professionals "to not use [pain pumps] for continuous intra-articular infusion of local anesthetics after orthopedic surgery." In the same report, the FDA stated that it "has not cleared any [pain pumps] with an indication for use in intra-articular infusion of local anesthetics."

21. Plaintiff Ryan Claridge grew up in Michigan and was an exceptional multi-sport athlete in high school and college.

22. Ryan Claridge attended college and played NCAA football at the University of Nevada, Las Vegas (UNLV), from 2000 to 2004, under UNLV's head coach John Robinson, who had previously been the head football coach for USC in the PAC-10 and the Los Angeles Rams in the NFL. Ryan was a star linebacker at UNLV.

23. In 2005 Ryan Claridge was drafted by the New England Patriots as a linebacker and given a four-year contract.

24. During the summer of 2005 Ryan Claridge suffered a left shoulder injury during the Patriots' pre-season training camp.

25. Plaintiff Ryan Claridge underwent left shoulder arthroscopic surgery in August 2005 at Seven Hills Surgery Center, Henderson, Nevada, by Dr. Randy Yee. Dr. Yee inserted post-operatively into Ryan's left shoulder joint an On-Q pain pump manufactured and sold by Defendants I-Flow and DJO.

26. The On-Q pain pump infused anesthetic continuously for at least 48 hours into Ryan's shoulder joint for post-operative pain relief.

27. Unbeknownst to Dr. Yee and to Ryan Claridge, the On-Q pain pump killed the living chondrocytes in Ryan's shoulder cartilage, causing irreversible destruction of his shoulder cartilage.

28. During the following months, as Ryan followed his prescribed physical therapy in preparation to return to active duty with the New England Patriots, the normal expected improvement in range of motion and function and pain relief did not occur.

29. In fact, by the last several months of 2005, Ryan's shoulder worsened. He again saw Dr. Yee about the unusual lack of progress.

30. In January 2006, Dr. Yee did an exploratory arthroscopic examination of Ryan's left shoulder joint. This surgery occurred at a different surgery center, the Southern Hills Hospital and Medical Center in Las Vegas, Nevada.

31. Dr. Yee found extensive cartilage damage during the surgery. He removed dead and damaged cartilage. At the end of the surgery, Dr. Yee inserted into Ryan's shoulder joint a pain pump manufactured and sold by Defendant Stryker.

32. The pain pumps manufactured and sold by the Defendants destroyed Plaintiff Ryan Claridge's left shoulder, which rendered him unable to play football in the NFL for the New England Patriots or any other team.

33. Plaintiff Ryan Claridge's injuries resulted in severe and permanent injuries and impairments to his left shoulder and very severe lifetime impairments, pain, and restrictions to his activities of daily living.

34. As a direct result of the destruction of Plaintiff's shoulder joint from Defendants' pain pumps, Plaintiff has suffered multiple harms and losses, including, but not limited to, severe physical pain, mental suffering, loss of the enjoyment of life, past and future medical, surgical, and related expenses, impairment, disfigurement, past and future loss of earnings and earning capacity, and loss of household services.

35. Plaintiff learned for the first time in the spring of 2018 that the pain pumps placed in his shoulder joint for post-operative pain relief had killed the living cells of his shoulder cartilage, which led to the destruction of his shoulder joint cartilage and the recent diagnosis of chondrolysis.

/ / /

/ / /

## FIRST CAUSE OF ACTION
### (Strict Products Liability)
*Against All Defendants*

36. Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

37. Defendants designed, tested, manufactured, assembled, labeled, marketed, distributed, and/or sold pain pumps, including those used in Plaintiff Ryan Claridge's surgeries.

38. These pain pumps were defectively designed in that, among other things, the continuous infusion of post-surgical anesthetic solution at the delivery rates achieved by the pain pumps can cause permanent shoulder injury, namely, severe chondrolysis and total destruction of cartilage and surrounding tissue.

39. As a result of this design defect, Defendants' pain pumps are unreasonably dangerous.

40. As a result of their design, the pain pumps were more dangerous than an ordinary and reasonable user of the pain pumps would expect, considering the pain pumps' characteristics, uses that were foreseeable to Defendants, and any instructions or warnings given by Defendants.

41. Plaintiff Ryan Claridge neither knew nor should have known of the danger posed by use of Defendants' pain pumps in or near the shoulder joint.

42. Plaintiff Ryan Claridge's surgeon did not have actual knowledge sufficient to know the danger posed by use of Defendants' pain pumps in or near the shoulder joint, and Defendants did not give Plaintiff Ryan Claridge or his surgeon sufficient warning regarding the danger posed by use of Defendants' pain pumps in or near the shoulder joint.

43. The design defects in Defendants' pain pumps were present at the time Defendants manufactured, distributed, and sold the pain pumps.

44. Defendants knew, or reasonably should have known, of the danger posed by use of their pain pumps in or near the shoulder joint.

45. Defendants were required to warn about the danger posed by the foreseeable use of their pain pumps in or near the shoulder joint.

46. Defendants failed to provide an adequate warning to Plaintiff Ryan Claridge or his surgeon at the time Defendants' pain pumps were manufactured, distributed, and sold, in that, in light of

the ordinary knowledge common to members of the community who use Defendants' pain pumps, Defendants failed to:

    a.    provide a warning that was designed to reasonably catch the attention of Plaintiff Ryan Claridge and his surgeon;

    b.    provide a warning that was understandable to Plaintiff Ryan Claridge and his surgeon;

    c.    provide a warning that fairly indicated the danger from the pain pumps' foreseeable use in or near the shoulder joint;

    d.    provide a warning that was sufficiently conspicuous to match the magnitude of the danger posed by use of the pain pumps in or near the shoulder joint;

    e.    provide a warning that the safety and effectiveness of the devices for use in the shoulder joint space had not been established; and

    f.    provide a warning that when used as designed, the Defendants' pain pumps delivered, over time, dangerously high doses of medication directly into the shoulder joint.

47. Defendants' failure to provide an adequate warning made Defendants' pain pumps defective and unreasonably dangerous.

48. The pain pumps were unreasonably and dangerously defective because at no time did Defendants conduct adequate testing to determine whether pain pumps placed for infusion in or near the joint space could cause damage to articular cartilage.

49. The defects in the pain pumps were a proximate cause of the Plaintiff's harms and losses.

50. As a direct result of the use of the pain pumps in Plaintiff Ryan Claridge's shoulder, Plaintiff has suffered harms and losses, including, but not limited to, severe physical pain, mental suffering, loss of the enjoyment of life, past and future medical, surgical, and related expenses, impairment, disfigurement, past and future loss of earnings and earning capacity, and loss of household services.

///

**SECOND CAUSE OF ACTION**
(Negligence)
*Against All Defendants*

51. Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

52. Defendants had a duty to design, manufacture, test, inspect, assemble, label, market, distribute, and sell the pain pumps so as to eliminate any unreasonable risk of foreseeable injury.

53. At all relevant times, Defendants breached this duty and failed to use reasonable care in designing, manufacturing, testing, inspecting, assembling, labeling, marketing, distributing, and selling their pain pumps. Defendants' negligence includes, but is not limited to, the following:

   a. Defendants failed to conduct a proper assessment and analysis of the design and assembly of the pain pumps;

   b. Defendants failed to properly test and/or inspect the pain pumps in the environment in which they were to be used to ensure that the pain pumps would be safely used in a manner and for a purpose for which they were made;

   c. Defendants promoted and marketed their pain pump for use in shoulder surgery even though—

       i. Use of the pain pump in the joint space had not been cleared by the FDA, and in fact had been specifically rejected by the FDA;

       ii. Continuous injection of anesthetic medications, through a catheter, directly into the shoulder joint for two or more days had not been adequately tested for safety or effectiveness;

       iii. The risk of chondrolysis and other serious post-operative problems associated with using the pain pumps as designed and instructed outweighed the possible benefits of such use.

       iv. Defendants failed to provide adequate warnings and instructions to Plaintiff Ryan Claridge and to physicians and medical providers using the pain pumps; and

       v. Defendants failed to recall the pain pumps.

54. Defendants' negligence was a proximate cause of the Plaintiff's harms and losses.

## THIRD CAUSE OF ACTION
### (Breach of Express Warranty)
*Against All Defendants*

55. Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

56. On information and belief, the Defendants expressly warranted that the pain pumps were safe for their intended use.

57. The Defendants breached any express warranties.

58. The Defendants' breaches of any express warranties were a proximate cause of the Plaintiff's harms and losses.

## FOURTH CAUSE OF ACTION
### (Breach of Implied Warranty of Merchantability)
*Against All Defendants*

59. Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

60. Defendants impliedly warranted that their pain pumps, together with instructions and materials explaining their selection and use, were reasonably fit for the ordinary purposes for which such products are intended and were merchantable.

61. The Defendants breached their implied warranties of merchantability in that, at the time of their placement into the stream of commerce and at the time of Plaintiff Ryan Claridge's injuries, the pain pumps, together with instructions and materials explaining their selection and use, were not reasonably fit for the ordinary purposes for which such products are intended and were unmerchantable to users and consumers.

62. The Defendants' breaches of the implied warranty of merchantability were a proximate cause of the Plaintiff's harms and losses.

## FIFTH CAUSE OF ACTION
### (Breach of Implied Warranty of Fitness for a Particular Purpose)
*Against All Defendants*

63. Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

64. At the time of placement of Defendants' pain pump into the stream of commerce, and at the time of Plaintiff Ryan Claridge's surgeries, Defendants knew or had reason to know that:

      a.    Plaintiff Ryan Claridge and his surgeon wanted Defendants' pain pump for a particular purpose, namely, to aid in Plaintiff Ryan Claridge's healing from shoulder surgery; and

      b.    Plaintiff Ryan Claridge and his surgeon were relying on Defendants' skill or judgment to select or furnish a suitable device.

65. Defendants impliedly warranted that the pain pump, together with instructions and materials explaining its selection, installation, and use, were fit for the particular purpose for which such items were required for use by Plaintiff Ryan Claridge.

66. The Defendants breached their implied warranties of fitness for a particular purpose in that, at the time of their placement into the stream of commerce and at the time of the aforesaid injuries to Plaintiff Ryan Claridge, Defendants' pain pumps, together with instructions and materials explaining their selection, installation, and use, were not fit for the particular purpose for which Plaintiff's surgeon and Plaintiff Ryan Claridge required them.

67. The Defendants' breaches of the implied warranty of fitness for a particular purpose were a proximate cause of the Plaintiff's harms and losses.

**SIXTH CAUSE OF ACTION**
**(Misrepresentation and Fraudulent Concealment)**
*Against all Defendants*

68. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

69. Defendants had a duty to provide truthful information and to not provide misleading information about their pain pumps to surgeons and the public, including the Plaintiff.

70. Defendants, by and through their highest levels of management and leadership, and implemented through their employees, agents, and sales representatives, made misrepresentations or omissions of facts material to physicians to induce them to choose post-arthroscopic surgery use of pain pumps for their patients' pain relief.

71. Defendants' misrepresentations included, but were not limited to, the following:

      a.    That post-arthroscopic shoulder surgery pain pump use in the shoulder joint was

        safe;

    b.    That pain pumps had been used for years in other parts of the body, and therefore were safe for use in shoulder joints;

    c.    That post-arthroscopic shoulder surgery pain pump use in the shoulder joint had been tested and testing had determined such use to be safe; and

    d.    That the FDA had approved in some fashion, or had not advised against or prohibited, the use of pain pumps in the shoulder joint for post-arthroscopic shoulder surgery pain relief.

72. Defendants knew or should have known at the time that they made their misrepresentations and omissions that they were false.

73. Defendants, at the highest levels of their management and leadership, caused multiple material misrepresentations and/or omissions to be made to surgeons and others involved in the purchase and use of pain pumps, by and through false and misleading information taught to and disseminated by Defendants' employees and agents, including pain pump sales representatives who routinely appeared in surgical operating rooms promoting the use of pain pumps to shoulder surgeons such as Dr. Yee.

74. Defendants caused the above-described misrepresentations to be made about their pain pumps intentionally, recklessly and without regard for the truth.

75. Defendants failed to use reasonable care to determine whether their representations were true.

76. Defendants were in a better position than surgeons to know the true facts.

77. Defendants had a financial interest in transactions dependent on the facts as represented by Defendants.

78. Defendants intended that surgeons, including Plaintiff's shoulder surgeon, would rely on their misrepresentations and omissions.

79. Plaintiff's physician reasonably relied upon Defendants' misrepresentations and omissions.

80. The Defendants intentionally or negligently did not alter or correct the disseminated information they knew to be misrepresentations or omissions.

81. By reason of Dr. Yee's reasonable reliance on Defendants' misrepresentations and omissions of material fact, Dr. Yee implanted Defendants' pain pumps into Plaintiff's left shoulder joint in 2005 and 2006, each of which infused anesthetics continuously into Plaintiff's intra-articular joint for over 48 hours, and each of which caused irreparable destruction to his shoulder cartilage.

82. As a direct and proximate result of Defendants' intentional and/or reckless misrepresentations, Plaintiff Ryan Claridge has suffered and continues to suffer egregious and lifelong injuries, pain, restrictions, disfigurement, impairments and damages.

83. As a direct and proximate result of Defendants' intentional and/or reckless misrepresentations, Plaintiff Ryan Claridge has suffered and continues to suffer lifelong medical, medication, and related expenses and costs; the loss of his professional NFL football career; substantial loss of past and future income and benefits; severely impaired earning capacity; and other substantial related economic damages.

84. Plaintiff is entitled to recover damages caused by Defendants' misrepresentations in an amount to be determined at trial.

85. Defendants were under a continuing duty to disclose the true facts regarding pain pump use for intra-articular joint use, and knowingly and fraudulently concealed the true facts.

86. Plaintiff and the medical community were kept in ignorance of important information essential to the pursuit of these claims, without any fault or lack of diligence on their part. As a result of Defendants' fraudulent concealment of the true facts, Plaintiff and the medical community could not reasonably have known or become aware of the dangerous nature of pain pumps in intra-articular joints at the time of Plaintiff's left shoulder surgeries by Dr. Yee.

87. Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment and denial of the true facts regarding intra-articular use of their pain pumps.

## **DAMAGES**

88. Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

89. As a direct and proximate result of the Defendants' fault set forth generally above, Plaintiff has suffered and will suffer the following damages, in amounts to be proved at trial:

   a. General damages for severe physical pain, mental suffering, impairment, disability, disfigurement, and loss of the enjoyment of life suffered by Plaintiff Ryan Claridge;

   b. Past, present, and future damages for the costs of medical, surgical, rehabilitative treatment and related expenses and care for Plaintiff Ryan Claridge;

   c. Past and future loss of wages, earnings and earning capacity of Plaintiff Ryan Claridge;

   d. Damages for Plaintiff Ryan Claridge's loss of household services; and

   e. Plaintiff's costs of this action, together with interest on special and general damages from the date of occurrence at the legal rate until paid, interest on any judgment awarded herein at the legal rate until paid, and other and further relief as the Court deems equitable and just.

**PUNITIVE DAMAGES**

90. As early as 1999, Defendants knew that the FDA had not approved use of pain pumps in or near the shoulder joint space, but they continued to market and promote pain pumps specifically for orthopedic, joint-space use.

91. Defendants knew that the safety of their pain pumps for orthopedic and joint-space use had not been established, yet they actively marketed and promoted their pain pumps to orthopedic surgeons for orthopedic use, including joint-space use, without ever conducting studies to determine the safety of such use.

92. Despite the above, Defendants continued to market pain pumps for joint-space use and did not issue a warning to inform the public that the safety of pain pumps in the joint space had not been established.

93. These acts and omissions of Defendants show that the Defendants have acted with oppression, fraud, or malice, express or implied, that their conduct was willful and malicious or

intentionally fraudulent, or that they engaged in despicable conduct with a conscious disregard of the rights or safety of others, including Plaintiff, consciously and deliberately disregarding known safety measures in reckless disregard of the possible results. Defendants' conduct makes them liable to Plaintiff for punitive or exemplary damages, in an amount to be subject to proof at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants awarding the following:

1. A monetary award sufficient to compensate Plaintiff for the following categories of damages:

   a. General damages for severe physical pain, mental suffering, inconvenience, impairment, disfigurement, and loss of the enjoyment of life suffered by Plaintiff Ryan Claridge;

   b. Past, present, and future damages for the costs of medical, surgical, rehabilitative treatment and related expenses and care for Plaintiff Ryan Claridge;

   c. Past and future loss of wages, earnings and earning capacity of Plaintiff Ryan Claridge; and

   d. Damages for Plaintiff Ryan Claridge's loss of household services.

2. Punitive damages, in an amount to be subject to proof at trial.

3. Plaintiff's costs of this action.

4. Interest on past and future special damage amounts from the date of injury at the legal rate until paid.

5. Interest on any judgment awarded herein at the legal rate until paid.

6. Such other and further relief as the Court deems equitable and just.

/ / /

/ / /

/ / /

/ / /

## **JURY DEMAND**

Plaintiff requests a jury trial in this case.

DATED this 30th day of August, 2018.

          GLEN LERNER INJURY ATTORNEYS

          */s/ Corey M. Eschweiler*
          Corey M. Eschweiler
          Attorneys for Plaintiff

          DEWSNUP KING OLSEN WOREL
          HAVAS MORTENSEN

          */s/ Colin P. King*
          Colin P. King
          Attorneys for Plaintiff